UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ALLEN BUCCI,              :
                                :CIVIL ACTION NO. 3:15-CV-1945
        Plaintiff,              :
                                :(JUDGE CONABOY)
        v.                      :
                                :
CAROLYN W. COLVIN,              :
Acting Commissioner of          :
Social Security,                :
                                :
        Defendant.              :
                                :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from Defendant's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 1.)  Plaintiff alleged disability beginning on January 7, 2014. (R. 48.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Patrick S. Cutter, concluded in his January 9, 2015, decision that Plaintiff had the severe impairments of Third Degree Burns, Depression, and Anxiety and the non-severe impairments of asthma, COPD, and GERD.  (R. 50-51.)  He further found that Plaintiff's impairments did not alone or in combination meet or equal the listings.  (R. 51-52.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy.  (R. 53-61.)  ALJ Cutter therefore found Plaintiff was not

disabled under the Act from January 7, 2014, through the date of the decision.  (R. 61.)

    With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ did not acknowledge and identify how he evaluated all medically determinable impairments established in the record; and 2) the ALJ did not properly evaluate the opinion evidence of record.  (Doc. 12 at 12.)  After careful review of the record and the parties' filings, I conclude this matter is properly remanded.

## I. Background

### A.    Procedural Background

    Plaintiff filed for DIB on February 13, 2014, and for SSI on September 3, 2014, alleging disability beginning on January 7, 2014, in both applications.  (R. 48.)  The claims were initially denied on May 22, 2014, and Plaintiff filed a request for a hearing before an ALJ on June 3, 2014.  (*Id.*)

    ALJ Cutter held a hearing on December 12, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Sheryl Bustin.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on January 9, 2015, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 61.)

    On February 13, 2015, Plaintiff filed a Request for Review

with the Appeals Council.  (R. 42-44.)   The Appeals Council denied Plaintiff's request for review of the ALJ's decision on August 6, 2015.  (R. 3-9.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 3.)  In the denial, the Appeals Council noted that evidence submitted directly to the Council concerned a time after the ALJ's decision, and, therefore, did not affect the decision about whether Plaintiff was disabled as of the date of the decision, January 9, 2015.  (R. 4.)

On October 6, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 10, 2015.  (Docs. 8, 9.)  Plaintiff filed his supporting brief on March 3, 2016.  (Doc. 12.)  Defendant filed her brief on April 8, 2016.  (Doc. 13.)  Plaintiff filed his reply brief on April 22, 2016.  (Doc. 16.)   Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Because Defendant's brief does not contain a factual background and she states that she does not dispute the objective medical facts presented by Plaintiff (Doc. 13 at 2), the Statement of Facts set out by Plaintiff is repeated here.[1]

---

[1] Defendant adds that she disputes subjective statements such as allegations that impairments cause disabling functional limitations, and she also disputes the medical opinions that are unsupported and inconsistent with the ALJ's residual functional capacity finding.  (Doc. 13 at 2.)

3

Mr. Bucci was born in September 1971 (R. 88, 162). He dropped out of high school in 10th grade but later earned a GED (R. 71, 183-85, 527). He had worked as a construction laborer, a tire store supervisor, and a landscaping supervisor (R. 60, 79-80, 212-19).

The record showed Mr. Bucci had physical and mental health impairments including severe burns with skin grafts and chronic pain, asthma, hypertension, post-traumatic stress disorder ("PTSD"), major depressive disorder, anxiety and insomnia. (R. 248-50, 259-62, 326-28, 335-37, 512-23, 526-27, 529-33, 538-39, 618-24, 648-51, 652-63, 729-80). He also had a history of substance abuse, but was in treatment and was recovering (R. 336-37, 580).

On January 7, 2014, Mr. Bucci suffered severe burns at work while transferring gasoline near a propane-powered heater. His clothing, which had become soaked in gasoline, caught on fire. He sustained second and third degree burns on approximately thirty-three percent (33%) of his body, including his bilateral upper extremities (left worse than right), his left lower extremity, and his left flank and trunk (R. 248-50, 259-62, 322). He was initially transported to the Hershey Medical Center trauma center but was then transferred to the Lehigh Valley Hospital burn center for further evaluation and management (R. 248-50, 312-28). While admitted to the Lehigh Valley burn unit, Mr. Bucci underwent numerous procedures over the next several weeks to debride and excise his burns as well as numerous skin-grafts (R. 312-28, 430-44). His hospital course of treatment was complicated by infection from donor skins, acute blood loss, anemia and he developed generalized weakness due to prolonged bed rest (R. 249-50).

At the end of January 2014, Mr. Bucci was transferred to the HealthSouth

4

Rehabilitation Hospital, where he received daily physical therapy, occupational therapy, wound care and medical management.  He was discharged to home in February 2014.  (R. 336-64).  Home health nurses attended him at home for several weeks to provide physical therapy and skilled nursing.  Mr. Bucci required a walker to ambulate, assistance with daily activities, and care of skin grafts and open wounds.  (R. 437-502).

In March and April 2014, Mr. Bucci participated in formal physical therapy at Drayer Physical Therapy.  (R. 582-617).  Mr. Bucci continued to have tight skin and hypersensitivity, limited mobility; stretching and physical therapy resulted in skin tears of his graft.  He also had an open draining wound behind his left knee.  These non-healing wounds were very painful.  Mr. Bucci also had hypersensitivity on his right thigh and calf, which were donor sites for his skin grafts (R. 602, 650, 701, 704, 705, 744).

In April 2014, Patrick Pagelia, CRNP of the Lehigh Valley Burn Center outpatient clinic, observed Mr. Bucci had an altered gait, variation in sensitivity in areas of scars, guarded full shoulder extension due to scarring on his left upper arm and tightness with full extension of his left knee (R. 707, 713).  Mr. Pagelia prescribed a knee immobilizer (R. 724), ordered "no work until medically cleared", counseled Mr. Bucci on the natural progression in scar healing, and "reinforced that the normal time for scar activity is 4-6 months from wound closure with 12-18 months required for remodeling of skin/scar, however full scar maturation may take up to 5 years" (R. 708).

Mr. Bucci was referred to plastic surgery in May and July 2014 (R. 538-39, 647).  On examination, he had skin tears and ulcerations at graft sites, non-healing and painful open wounds, hypersensitivity, and significant scar tissue.  The skin graft on

5

his trunk had some areas of scarring in some regions and hypersensitivity.  On his left leg, there was an open wound in the area behind his knee, with surrounding fibrosis of the soft tissue and some serous draining. There were a few other small open areas on his posterior thigh.  Mr. Bucci experienced limited mobility due to scarring and tearing. The treatment plan was to excise the wounds and fibrotic tissue, place a full-thickness skin graft, and keep his leg straight in a fully-extended position using a knee immobilizer to allow it to heal.  However, this surgery could not be completed unless and until Mr. Bucci stopped smoking.  Mr. Bucci was started on Chantix for tobacco cessation (R. 618-27).

Mr. Bucci began treating with his primary care physician, Dr. Abraham R. Taylor, M.D. in February 2014 for the pain related to his extensive burns (R. 512-23). Mr. Bucci's treatment was complicated by his history of opiate addiction for which he participated in a methadone maintenance program since September 2012.  (R. 550, 580, 650, 652, 654).  Dr. Taylor thought that the best plan of action would be to prescribe increased levels of methadone for Mr. Bucci's pain in order to avoid multiple medications; however, Mr. Bucci's methadone provider was unwilling to use methadone to treat for pain, as it was prescribed only for withdrawal symptoms.

Dr. Taylor referred Mr. Bucci to Dr. David M. Giampetro, M.D. in July 2014 for a pain management consultation (R. 648-49). Dr. Giampetro noted that Mr. Bucci experienced pain secondary to burn injuries and post skin grafting, decreased sleep, appetite and activity since his injury and observed mild drowsiness.  Dr. Giampetro described Mr. Bucci's current pain medication regimen which included Fentanyl patches, Dilaudid, Gabapentin, Ibuprofen 800, and Methadone for his heroin addiction maintenance.  Dr. Giampetro concurred with

6

Dr. Taylor's sentiments that it would be worthwhile to switch the methadone to a daily regimen, co-managed with psychiatrist, and noted it would be best to avoid using conventional treatment with opiates due to Mr. Bucci's relatively recent polysubstance abuse (R.649).

Dr. Taylor continued to treat Mr. Bucci throughout 2014 for his chronic pain and repeatedly noted Mr. Bucci's reports of severe pain from burns that had not healed, skin ulcerations, tears, blistering, and limited range of motion.  Mr. Bucci's pain was particularly severe on his back, the side of his torso, and his posterior left leg where he had unhealed wounds, tears, and failing skin grafts.  (R. 512-23, 538-74, 644-46, 650-63, 729-64).

Dr. Taylor completed a statement in November of 2014 indicating that Mr. Bucci suffered from extensive skin lesions involving multiple body sites or critical body areas that result in a very serious limitation and can be expected to last for a continuous period of at least 12 months. Moreover, his statement indicates Mr. Bucci suffered from a soft tissue injury of an upper or lower extremity, trunk, face/head, is under continuing surgical management directed toward the salvage or restoration of functional use of the affected part, and it was uncertain whether function could be expected to be restored within 12 months (R. 726).

Dr. Taylor also completed a statement indicating that Mr. Bucci can work zero hours per day, can stand for 1 hour at a time and sit for 3 hours at a time.  Dr. Taylor also indicated that in an 8-hour work day Mr. Bucci could stand for 3 hours and sit for 4 hours.  He was limited to lifting 11-20 pounds, could only occasionally reach, push/pull, handle, finger, or feel with his left upper extremity, and could occasionally operate controls with his left foot (R. 727-28).

7

The State Agency non-examining physician also submitted an opinion as to Mr. Bucci's physical condition in May 2014, projecting that by January 6, 2015 Mr. Bucci would be limited to lifting 10-20 pounds and would be able to stand 6 hours in an 8 hour workday, would have no limits pushing or pulling, and would occasionally be able to climb, balance, stoop, kneel crouch, or crawl (R. 95-97).

Dr. Taylor also treated Mr. Bucci for his other medical conditions, including asthma and PSTD, that Mr. Bucci developed related to his trauma (R. 512-23).  Mr. Bucci had also begun to experience severe anxiety with panic attacks, fear of leaving his home, and nightmares and flashbacks of being on fire.  Mr. Bucci began treating at Laurel Life in April 2014 for his anxiety, depression, insomnia and panic attacks (R. 525-58).  He continued to have flashbacks and nightmares of the event.  Dr. M. Ralph Picciotto, M.D., a psychiatrist, diagnosed Mr. Bucci with PTSD and assessed him with a global assessment of functioning score ("GAF") of 40.  He was prescribed Cymbalta, Xanax, Prazosin, and Ambien (R. 527).  Mr. Bucci began to meet with a therapist for individual counseling once every week (R. 529).  He continued to seek psychiatric treatment, but despite medication and weekly therapy, continued to report insomnia, nightmares, depression and anxiety (R. 628-43).

Mr. Bucci underwent a mental health evaluation by Michael DeWulf, Ph.D. in April of 2014, at the request of the Commissioner's State agency (R. 529-33).  Dr. DeWulf documented Mr. Bucci's background and noted Mr. Bucci had a history of several inpatient hospitalizations for suicidal ideation and a diagnosis of major depression.  Dr. DeWulf noted that Mr. Bucci reported "frequent nocturnal awakenings averaging approximately seven to eight per night."  Dr. DeWulf also wrote that Mr. Bucci described decreased

8

appetite, symptoms of dysphoria, anhedonia,
diminished self-esteem, fatigue, energy loss,
and recurrent thoughts of death or suicide
(R. 530).  Dr. DeWulf diagnosed Mr. Bucci
with major depression, single and recurrent
episodes, unspecified anxiety disorder and
PTSD (R. 532).  Dr. DeWulf found his
prognosis "fair" given the chronic nature of
his mental health problems, the severity of
symptoms, and a history of suicidal ideation;
however, in an assessment of Mr. Bucci's
ability to do work-related activities, Dr.
DeWulf found no limitations in his ability to
understand, remember, and carry out
instructions and only mild limitations in his
ability to interact appropriately with
supervision, co-workers, and the public.  Dr.
DeWulf noted that these limitations were due
to "some anxiety, fearfulness of being
outdoors/riding in vehicles/heat, significant
depression, PTSD" (R. 534-35).

The State Agency non-examining
psychologist echoed Dr. DeWulf's opinion and
found Mr. Bucci's limitations mild and his
mental health impairments non-severe (R. 93-
95), noting that Dr. DeWulf's opinion was
consistent with the medical evidence of
record.

Mr. Bucci's fiancee, Christina Lembesis,
prepared a third party function report noting
that Mr. Bucci had night terrors where he
thinks he is on fire and will not sleep
through the night due to pain.  She also
reported that he needed help with self-care
and basic activities, was sluggish due to
medications, did not often socialize, did not
often go outside, and had difficulty lifting,
squatting, bending, standing and reaching,
walking, sitting, kneeling, climbing stairs,
completing tasks, concentrating,
understanding, using his hands, and getting
along with others (R. 205-11).

Mr. Bucci completed a function report
noting that he was in constant pain, had
limited range of motion, cannot walk

correctly or stand for long, did not have the strength he had before, still had open wounds that were open to infection and was nervous going outside and afraid of getting hurt.  He wrote that he has nightmares that he is on fire, has difficulty with personal care and chores, does not go out often, rarely socialized and has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, using his hands, and getting along with others.  He was often irritable with others and was seeing a psychiatrist for his anger and depression (R. 195-204).

At the hearing, Mr. Bucci testified that he is in chronic pain on the left side of his body and in his back.  He testified that he is left-handed and had difficulty moving his arms, legs and hands and still had open wounds.  He testified he could only stand for 20-30 minutes and had difficulty walking.  He testified he has a lot of anxiety, has difficulty sleeping, and has limited range of motion.  He testified that his medications make him drowsy, that he sleeps a lot during the day and naps daily for 1-2 hours off and on (R. 72-77).

A Vocational Expert ("VE") testified at the hearing that work existed for an individual who could perform full-time light work, but only stand for 2 hours per day for 30 minutes at a time and could occasionally use the non-dominant hand with non-exertional limitations (R. 81).  The VE also testified that an individual who could sit up to four hours per day and stand/walk for up to three hours per day would not be employable as the national standard for full-time work is 7.5 to eight hours per day.  Also, an individual who was off task more than 15% of the day or missed work more than 1.5 days per month would not be able to maintain competitive employment (R. 80-86).

(Doc. 12 at 2-12.)

**C.    *ALJ Decision***

ALJ Cutter made the following Findings of Fact and Conclusions of Law in his January 9, 2015. Decision.

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2.    The claimant has not engaged in substantial gainful activity since January 7, 2014, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: Third Degree Burns, Depression and Anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is capable of standing for 2 hours in an 8 hour workday, for 30 minutes at one time, and sitting for 4 hours in an 8 hour workday.  The claimant is prohibited from climbing ladders, ropes and scaffolds, kneeling, crouching, crawling or using left foot controls.  The claimant is also prohibited from operating motor vehicles, working at unprotected heights or working involving moving mechanical parts.  The claimant is capable of occasionally climbing ramps and stairs,

balancing and stooping.  The claimant is capable of occasionally using his left dominant upper extremity for reaching, pushing, pulling, handling, fingering and feeling. The claimant is capable of performing work not involving exposure to temperature extremes, high humidity and wetness. The claimant is capable of tolerating occasional exposure to dust, fumes and gases.  The claimant is capable of performing routine, repetitive, 1 and 2 step tasks.  The claimant is capable of performing work involving occasional changes in the work setting and occasional decision making.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on September 10, 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

> 11.  The claimant has not been under a
>       disability, as defined in the Social
>       Security Act, from January 7, 2014,
>       through the date of this decision (20
>       CFR 404.1520(g) and 416.920(g)).

(R. 50-61.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 60-61.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits,

15

"to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*,

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ did not acknowledge and identify how he evaluated all medically determinable impairments established in the record; and 2) the ALJ

did not properly evaluate the opinion evidence of record.  (Doc. 12
at 12.)

A.    *Medically Determinable Impairments*

Plaintiff asserts the ALJ did not acknowledge that Plaintiff
suffered from PTSD or explain why he rejected it as a medically
determinable impairment and this error is cause for reversal.
(Doc. 12 at 14-17.)  Defendant maintains that this argument lacks
merit for several reasons: the ALJ did not decide the case at step
two; the mere fact that Plaintiff had been diagnosed with PTSD does
not establish severity; and the record supports the ALJ's finding
that Plaintiff's PTSD was not severe.  (Doc. 13 at 4-7.)  I
conclude this matter must be addressed upon remand.

First, I note that Defendant's argument encompasses an
assertion that the ALJ made a finding that Plaintiff's PTSD was not
severe.  (Doc. 13 at 7.)  However, a review of the ALJ's Decision
does not support the assertion: the only impairments which the ALJ
reviewed and considered non-severe were asthma, COPD, and GERD.
(R. 51.)  ALJ Cutter does not mention PTSD at steps two or three.
Thus, while it may generally be true that a failure to properly
assess an impairment at step two is harmless where the ALJ proceeds
through the sequential evaluation process, *see*, *e.g.*, *Salles v.
Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007), a total
failure to address an impairment that has accompanying functional
limitations cannot so readily be deemed harmless.  Here Defendant

incorrectly asserts the ALJ found "that Plaintiff's mental impairment of PTSD was not severe." (Doc. 13 at 7.) Defendant does not address the situation here, i.e., *no assessment* of the severity of a diagnosed mental impairment. This is not to say that the impairment is severe or non-severe--only that the record shows it is a diagnosed mental health condition. (*See* R. 527, 532, 534-35.) Therefore, I conclude that Defendant does not properly support the first basis upon which error is claimed.

Defendant's second basis--"the mere fact that Plaintiff has been diagnosed with PTSD ([R] 527, 532, 550, 556, 649) does not establish severity" (Doc. 13 at 7)--is true as a statement but, without more, it does not undermine the merit of Plaintiff's asserted error. Defendant quotes *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004), for support: "It is well established that the mere 'diagnosis of an impairment, by itself, does not establish entitlement to benefits under the Act'; instead a claimant 'must show that the impairment resulted in disabling limitations.'" (Doc. 13 at 7.) Plaintiff points to limitations associated with his PTSD. (Doc. 12 at 15-16.) Whether the limitations are disabling is not for the Court to determine here. However, based on the record and Defendant's brief, the Court can conclude that the ALJ did not address the diagnosed impairment which Plaintiff claims contributed to his disabling limitations and Defendant does not present an argument that would render this omission harmless.

19

Defendant's third assertion--that "the record supports the ALJ's finding that Plaintiff's mental impairment of PTSD was not severe" (Doc. 13 at 7)--has already been addressed and found erroneous.[3]  Plaintiff's argument is that the ALJ "failed to even acknowledge" his PTSD which was "a distinct and discrete diagnos[i]s with specific diagnostic criteria and manifestations" (Doc. 16 at 2) and a review of the ALJ decision supports the accuracy of this assessment.

Because the reasons identified by Defendant to support the assertion that Plaintiff's argument regarding PTSD is without merit have been found wanting, I cannot conclude this claimed error is without merit.  Therefore, this issue must be addressed upon remand.

**B.    *Opinion Evidence***

Plaintiff asserts that the opinion evidence upon which the ALJ relied does not support his findings.  (Doc. 12 at 18.)  Defendant maintains that substantial evidence supports the ALJ's assessment of the medical opinions of record.  (Doc. 13 at 9.)  I conclude this claimed error is cause for remand.

Plaintiff specifically argues that the ALJ incorrectly relied on the State agency medical consultant because that review took

---

[3] In the discussion following his RFC finding, ALJ Cutter acknowledges that Dr. Picciotto and Dr. DeWulf diagnosed PTSD.  (R. 56, 57.)  However, the ALJ does not indicate any finding regarding the severity of the PTSD anywhere in his Decision.

place only a few months after Plaintiff's accident and speculated about what Plaintiff's improvement would be after twelve months where the opinion of Dr. Taylor, the treating physician, took into account the more recent evidence which showed that Plaintiff's pain was not under control and he continued to have ulcerations and difficulties from burns and scarring.  (Doc. 12 at 18; Doc. 16 at 3.)  Plaintiff adds that because the State agency "non-examining physician was unable to review evidence that Plaintiff's burns had not healed as predicted, the ALJ had to undertake lay reinterpretations of medical evidence.  An ALJ may not reject a treating source opinion if only lay interpretation of medical evidence is inconsistent with the opinion."  (Doc. 12 at 19 (citing *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Doak v. Heckler*, 790 F.2d 26, 29-30 (3d Cir. 1986); *Ferguson v. Schweiker*, 765 F.2d 31, 36-37 (3d Cir. 1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983); *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano*, 596 F.2d 55, 58-59 (3d Cir. 1979); *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978)); *see also* Doc. 16 at 3-5 (citations omitted).)

Defendant contends that the ALJ appropriately weighed the opinion evidence, pointing to the fact that the decision regarding a claimant's ability to work is an administrative finding reserved to the Commissioner (Doc. 13 at 11 (citing 20 C.F.R. §§

404.1546(c), 416.946(c))), and asserting "as the ALJ discussed in his decision, the examination by Plaintiff's other physicians supported his RFC and were contrary to Dr. Taylor's opinion of an inability to work" (*id.*).  Defendant cites specific evidence of record in support of the latter contention.  (*Id.* at 11-12 (citing R. 95-97, 336, 337, 618, 644, 660, 662).)  Finally, Defendant points to Plaintiff's activities of daily living as supportive of the ALJ's determination that the opinion of State agency reviewer, Dr. Legaspi, was entitled to greater weight than that of Dr. Taylor.  (*Id.* at 12.)

     Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in your case, we will give it controlling

weight." 20 C.F.R. § 404.1527(c)(2).[4] "A cardinal principle

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); see also *Brownawell v. Commissioner of Social*

---

[4] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

*Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the

24

ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

ALJ Cutter stated that he assigned limited weight to Dr. Taylor's assessment for the following reasons:

25

> it is without adequate evidentiary support
> and it is inconsistent with the objective
> findings noted throughout the medical
> evidence of record, which indicates that the
> claimant only has small open areas on his
> left lower extremity and his pain is well
> controlled with medication management.
> (Exhibits 17F, 19F, 20F).  Further, Dr.
> Taylor's assessment is internally
> inconsistent, indicating that the claimant
> can work 0 hours per day, but he is able to
> stand for 3 hours in an 8 hour day and sit
> for 4 hours in an 8 hour workday.

(R. 58.)

First, a comparison of the record support cited by Defendant
and that cited by the ALJ shows that only two pages overlap, i.e.,
record pages 660 and 662 which are contained in Exhibit 19F cited
generally by ALJ Cutter (R. 58) and cited specifically by Defendant
in connection with the assertion that "[t]he remainder of Dr.
Taylor's opinions noted that Plaintiff experienced relief with pain
management" (Doc. 13 at 12).[5]  Review of the cited material does
not support the ALJ's proposition that Plaintiff's "pain is well
controlled with medication management."  (R. 58.)  While
Defendant's statement that Plaintiff "experienced relief with pain
management," may be true, such a relative statement, without more,
does nothing to support an argument that the relief experienced by

---

[5]  We review only evidence relied upon by the ALJ because
neither Defendant nor the Court can do what the ALJ should have
done--we cannot provide *post hoc* reasons for supporting the ALJ's
decision.  It is the ALJ's responsibility to explicitly provide
reasons for his decision and analysis later provided by Defendant
cannot make up for the analysis lacking in the ALJ's decision.
*Fargnoli*, 247 F.3d at 42; *Dobrowolsky*, 606 F.2d at 406-07.

Plaintiff contradicted Dr. Taylor's assessment regarding his limitations.  Moreover, the records cited by Defendant and relied upon by the ALJ do not support the ALJ's statement that Plaintiff's "pain is *well controlled* with medication management."  (R. 58 (emphasis added).)  Dr. Taylor's August 7, 2014, Outpatient Note contains an extensive review of pain management and difficulties with various medications used to manage Plaintiff's pain, including Methadone and Dilaudid--he does not opine that Plaintiff's pain is "well controlled" on the regimen.  (R. 660.)  Dr. Taylor also explained to Plaintiff the need for increased dosages of the medications to be gradually introduced and carefully monitored. (R. 660, 661.)  On August 15, 2014, Dr. Taylor noted that Plaintiff was getting "pretty good relief" during the daytime but from the evening dose to the morning dose he was "really having a lot of difficulties and a lot of pain."  (R. 662.)  Dr. Taylor again discussed increasing the Methadone dose and making other adjustments to address his pain.  (*Id.*)  These records clearly do not support ALJ Cutter's assessment that Plaintiff's pain is "well controlled with medication management."  (R. 58.)  Other records within the exhibits cited by ALJ Cutter also undermine his pain assessment.  In April 2014, CRNP Patrick Pagella of the Outpatient Lehigh Valley Hospital Burn Center recorded that Plaintiff noted he had limited mobility due to pain and tightness in the left posterior knee.  (R. 704.)  Plaintiff rated his pain at the time as

27

nine on a scale of one to ten.  (R. 710.)  On May 22, 2014,
Plaintiff reported to Dr. Taylor that his pain had been worsening
over the last several weeks related to a failing graft and more
fissures and tears behind his leg.  (R. 650.)  Dr. Taylor noted
that Plaintiff was approved for a disability placard given his
chronic pain. (*Id.*)  Dr. Taylor also noted on July 9, 2014, that
Plaintiff was "doing actually pretty well on his current pain
management regimen."  (R. 654.)  On July 16, 2014, Dr. Taylor
reported that Plaintiff had "severe pain" in some areas and the
record discusses transitioning Plaintiff to Methadone not for
opiate addiction but for pain.  (R. 656.)   On July 21, 2014, Dr.
Taylor noted that Plaintiff had "continued severe chronic pain" as
a result of his January 2014 burns.  (R. 658.)  In Septemeber 2014,
Dr. Taylor noted that Plaintiff "has been doing 60 mg morphine 3
times a day, which has been doing fairly well.  He is still having
some pain throughout the day intermittently but nights are still
problematic for him."   (R. 644.)

      I also find troublesome ALJ Cutter's assessment that
"objective findings . . . indicate that the claimant has only small
open areas on his left lower extremity."  (R. 58.)  Although
findings of "open areas" are limited, as partially recognized by
ALJ Cutter in his review of evidence (R. 54-56) (but not
acknowledged in his analysis of Dr. Taylor's opinion (R. 58)),
objective findings noted throughout the medical evidence of record

28

cited in his review of Dr. Taylor's opinion (Exs. 17F. 19F, 20F), indicated that Plaintiff's problems related to the January 2014 burns went beyond "only small open areas on his left lower extremity" (R. 58).  In May 2014, his pain was worsening due to a failing skin graft and "fissures and tears posterior behind his leg."  (R. 650.)  On July 21, 2014, Dr. Taylor noted that Plaintiff did not wrap his legs with the tubular dressings because he wanted Dr. Taylor to see some of the ulcerations.  (R. 658.)  On August 7, 2014, Plaintiff reported to Dr. Taylor that his wounds were blistering more and Dr. Taylor discussed sending him for a wound care consultation.  (R. 660.)  On August 15, 2014, Plaintiff reported that he was noticing some skin tears and ulcerations on his torso and the wound care consultation was pending.  (R. 662.) On examination, Dr. Taylor noted "several skin erosions and ulcerations" related to skin grafts on the left side of his torso. (*Id.*)

Records not specifically cited by the ALJ also arguably show concern beyond "only small open areas on his lower left extremity." (R. 58.)  On October 8, 2014, examination of his back revealed "a small 1 cm area of open yet healing wound as well as multiple areas of open wounds on his lower leg."  (R. 744.)  On December 29, 2014, Dr. Taylor noted that "complications of his wounds" prohibited topical treatments.  (R. 729.)  On September 11, 2014, Dr. Taylor authored the following letter.

> Mr. Bucci is a patient with high
> tolerant opioid recovery formerly at a
> methadone clinic on 120mg of methadone a day
> who then sustained severe widespread third
> degree burns over 33% of total body surface
> area that continues with pain from scarring
> and damaged sub-dermal structures due to
> these full thickness burns.  In addition, he
> has painful graft ulcerations where his
> grafts are tearing and going through graft
> failure for which he is following with
> plastics and wound care specialists.  These
> skin tears also are painful when he stretches
> areas of increased tension the skin will rip
> causing ulcerations.  He has been discharged
> from the methadone program and I am now
> prescribing increased methadone and
> hydromorphone for his complex pain.

(R. 751.)

This review of the record shows two main reasons cited by ALJ Cutter for affording limited weight to Dr. Taylor's opinion cannot be deemed substantial evidence in support of the assessment--based on the evidence cited by the ALJ and other evidence of record, a reasonable person could not conclude Plaintiff's pain was "well controlled" or that his burn-related problems were limited to "small open areas on his lower left extremity."  (R. 58.)

Finally, I conclude that ALJ Cutter's cited internal inconsistency in Dr. Taylor's assessment cannot carry the substantial evidence load. It is true that Dr. Taylor opined that Plaintiff could work 0 hours per day, and he was able to stand for 3 hours in an 8 hour day and sit for 4 hours in an 8 hour workday. (R. 726.)  However, given the somewhat ambiguous format of the medical statement regarding burns, an opinion that an individual

30

was able to sit or stand for a certain period of time during a workday does not necessarily equate with an opinion that the individual could work while sitting or standing for the designated period of time.

For all of these reasons, I conclude that ALJ Cutter's determination that Dr. Taylor's assessment was entitled to limited weight is not supported by substantial evidence.  In his determination that the opinion of Dr. Taylor, the treating physician, was not entitled to controlling weight, ALJ Cutter does not show that Dr. Taylor's opinion is inconsistent with other substantial evidence.  *See* 20 C.F.R. § 404.1527(c)(2).  He does not say whether or why he discounts Dr. Taylor's September 2014 explanation of Plaintiff's ongoing problems (R. 751).  *See Fargnoli*, 247 F.3d at 43.  Based on the reasons ALJ Cutter provides for discounting Dr. Taylor's opinion, and the analysis of those reasons set out above, it appears the ALJ may have relied only on personal observations and his lay interpretation of the evidence in his assessment and thus run afoul of relevant law.  *See Drejka*, 61 F. App'x at 782.  Therefore, this matter must be remanded for further consideration.

## V. Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this

31

opinion.  An appropriate Order is filed simultaneously with this Memorandum.


                                        S/Richard P. Conaboy
                                        RICHARD P. CONABOY
                                        United States District Judge


DATED: May 2, 2016